NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | | |
|---|---|---|
| LARRY D. BAKER, | : | |
| Plaintiff, | : | Civil No. 12-7251 (RBK) |
| v. | : | **OPINION** |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**KUGLER**, United States District Judge:

Plaintiff Larry D. Baker ("Mr. Baker") seeks judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") under Title II, and Social Security Supplemental Income ("SSI") under Title XVI of the Social Security Act ("SSA"). For the reasons set forth below, the decision is vacated and remanded to the Administrative Law Judge ("ALJ") for further consideration.

I.   BACKGROUND

Mr. Baker, a 42-year-old man born on September 11, 1971, submitted an application for DIB and SSI on March 2, 2010, alleging disability as of June 1, 2007, due to knee and back pain, allergies, and a learning disorder. (Administrative Record ("Rec.") at 11, 13, 111-14, 115-17, 130). His applications were initially denied on June 3, 2010, and were again denied upon reconsideration on September 9, 2010. (Rec. at 11, 50-55, 56-61, 65-67, 68-70). On October 8,

2010, Mr. Baker requested an administrative hearing, which was held on July 18, 2011 before ALJ Daniel W. Shoemaker, Jr. (Rec. at 23, 71-73).  On September 1, 2011, the ALJ issued a decision denying the claims, and on October 27, 2011, Mr. Baker appealed to the Office of Disability Adjudication and Review ("ODAR").  (Rec. at 1-4).  The ODAR Appeals Council declined to review the case on September 25, 2012, making the ALJ's decision the final decision of the Commissioner.  The instant action followed on November 21, 2012.  (Rec. at 1-4; Complaint ("Compl.") at 1).

### A. Alleged Physical Limitations

Mr. Baker alleges he is unable to work due to physical disabilities of knee and back pain and allergies[1] because he is unable to stand for long periods, squat, bend, lift objects greater than 20 pounds, or walk more than two to three blocks without pain.  (Rec. at 130, 137, 140-41).  He testified before the ALJ that he injured his back in prison, and that it prevents him from engaging in manual labor.  (Rec. at 34-35).

On May 5, 2010, Nithyashuba Khona, M.D. ("Dr. Khona") of Best Med Consultants, PA conducted an orthopedic evaluation of Mr. Baker at the request of the State of New Jersey's Department of Work Force Development.  (Rec. at 225).  During the evaluation, Mr. Baker stated he lost his last job due to low back pain and complained of back pain when sitting up from a supine position.  (Rec. at 227).  However, he displayed no acute distress, walked with a normal gait, could walk on heels and toes without difficulty, and did not need assistance getting on or off the examination table.  (Rec. at 226).  He had full range of motion ("ROM") of his cervical spine, upper extremities, and lower extremities.  (Rec. at 226).  He displayed no sensory

---

[1] Mr. Baker alleges that his allergies are a disabling condition; however, the ALJ found them not to be severe, and there is a dearth of medical evidence in the record on the subject of allergies.  The Court declines to address the allegation.

2

abnormalities, muscle atrophy, joint effusion, inflammation or instability.  (Rec. at 226).  Dr. Khona also notes full ROM in the thoracic and lumbar spine; however, there is an indication that the examination was limited due to Mr. Baker being unable to flex or extend his spine.  (Rec. at 226-27).  Mr. Baker was diagnosed with a history of low back pain and an X-Ray revealed mild degenerative changes at the L4 and L5 vertebrae.  (Rec. at 227, 230).

A disability determination explanation dated September 8, 2010 notes that Mr. Baker suffers from severe dysfunction in major joints and spine disorders.  (Rec. at 258).  However, based on the seven strength factors of the physical residual functional capacity ("RFC"), Mr. Baker was declared capable to perform heavy to very heavy work such as a silver wrapper, a sticker, or a stringer.  (Rec. at 262).

### B.     Alleged Mental Impairments

Mr. Baker further alleges inability to work due to mental impairments.  While incarcerated at Bayside State Prison ("Bayside"), he was diagnosed with a personality disorder and "rule out" (RO) mild mental retardation.  (Rec. at 178).  At his initial mental health intake, Dr. Elaine Rybka noted that Mr. Baker was placed in special needs services during his incarceration in 2001 due to complaints of anxiety; however, he was judged to be "med seeking" or malingering at that time.  (Rec. at 203).  He was tried briefly on Benadryl for possible insomnia.  (Rec. at 203).  His other mental health diagnoses include anxiety disorder not otherwise specified ("NOS"), but while at Bayside from July 30, 2008 to January 19, 2009, he denied mental health problems.  (Rec. at 203, 179-82).  On May 26, 2009 he was evaluated at Camden County Jail and again denied any mental health problems.  (Rec. at 223).

On April 9, 2010, Mr. Baker was referred to David Bogacki, Ph.D, for a mental status examination to assess the allegation of depression made on March 2, 2010.  (Rec. at 216-19).  He

presented with hypomanic symptoms, depression, and suicidal ideation without plan or intent. (Rec. at 217). He was socially inappropriate and reported problems sleeping. Id. Cognitive screening revealed poor insight and judgment, and he could calculate serial 3s but not serial 7s. Id. He recalled three of three objects immediately, but only one of three objects after five minutes. Id. Dr. Bogacki diagnosed depressive disorder NOS, RO bipolar disorder NOS, RO alcohol abuse, a history of antisocial conduct and a learning disorder NOS, with a global assessment of functioning ("GAF") of 60. Id.

The disability determination explanation dated September 8, 2010 noted that Mr. Baker suffers from severe affective disorders and a learning disorder. (Rec. at 258). Moderate difficulty in maintaining concentration, persistence, or pace was reported. (Rec. at 259). Mr. Baker was assessed to have moderate difficulty in remembering locations, work-like procedures, and detailed instructions. (Rec. at 260). Mr. Baker was not significantly limited in his ability to understand, remember, and carry out short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, and complete a normal workday and workweek. (Rec. at 260-61).

Following his appeal dated June 3, 2011, Mr. Baker was again referred to Dr. Bogacki for examination on June 28, 2011. (Rec. at 252). Dr. Bogacki noted that Mr. Baker was taking trazodone and citalopram at the time of the evaluation, and he administered the Wechsler Adult Intelligence Scale ("WAIS") IV test to determine Mr. Baker's intellectual functioning. Id. The WAIS IV test revealed an intelligence quotient ("IQ") of 51, but it was of questionable validity because Mr. Baker failed to exert maximum effort. Id. Dr. Bogacki notes that "[p]erhaps, he

4

may have a learning disability, but due to his lack of effort this cannot be definitively ruled in. Mild mental retardation can be ruled out." Id.

Mr. Baker also submitted evidence from the Camden County Board of Education and Woodrow Wilson High School as proof of his mental impairments. (Rec. at 234-48). On June 15, 1988, Mr. Baker was classified as neurologically impaired. (Rec. at 236). He had a history of attending special education programs for the neurologically impaired dating to September 10, 1980. (Rec. at 239). On March 17, 1983, a neurologist reported "soft neurologic findings." Id. Several tests were administered and Mr. Baker performed well below his grade level on all of them despite exerting strong effort. (Rec. at 240-42). His scores on the WISC-R assessment when he was 16 years old were 69 verbal, 77 nonverbal, and 71 full scaled score, which are "near or within the borderline range of intellectual ability." (Rec. at 244).

Mr. Baker testified before the ALJ that he has never held a long-term job and that he left several jobs due to problems with meeting production standards and interpersonal conflicts. (Rec. at 36-37). He stated he had behavioral problems in school, including cutting classes and "getting high." (Rec. at 26). He testified that he is paranoid about being poisoned due to prior bad experiences with people putting things in his drinks. (Rec. at 26).

### C. Administrative Law Judge Decision

The ALJ first decided that Mr. Baker has not engaged in substantial gainful activity since June 1, 2007. (Rec. at 13). The ALJ also found that Mr. Baker's learning disorder, depressive disorder, and personality disorder were severe enough to significantly limit his ability to perform basic work activities. Id. However, he found that Mr. Baker's alleged back and knee pain and allergies were not sufficiently severe to limit his ability to work. Id. The ALJ did not address potential alcohol or drug abuse.

The ALJ found that Mr. Baker did not have an impairment or combination of impairments that meets or equals the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Rec. at 14).  He evaluated Mr. Baker's learning disorder under 12.05 and his personality disorder under 12.08.  Id.  However, he did not evaluate Mr. Baker's severe depressive disorder against the criteria listed in 12.04 of Appendix 1.

In evaluating Mr. Baker's RFC, the ALJ relied on reports from Dr. Bogacki and Dr. Khona, as well as treatment records from Bayside.  (Rec. at 15).  He did not address the assessments by the Camden County Board of Education or Woodrow Wilson High School conducted in 1987-88.  The ALJ concluded that Mr. Baker's medically determinable mental impairments could reasonably be expected to cause the alleged symptoms, but that his statements concerning the intensity, persistence and limiting effects of these symptoms were not credible.  (Rec. at 15).  The ALJ relied on Mr. Baker's lack of effort during Dr. Bogacki's assessment and found the results inconclusive.  Id.  He considered the treatment records from Bayside which diagnosed Mr. Baker with a personality disorder but noted no sign of depression, anxiety, or agitation.  (Rec. at 15).  The ALJ noted that Mr. Baker reported no problems, takes no prescription medications, and never had a GAF below 60.  (Rec. at 16).

With respect to Mr. Baker's physical impairments, after considering Dr. Khona's assessment, the ALJ determined he is capable of work at all exertional levels.  Id.  The ALJ did not address the internal inconsistency in Dr. Khona's report.  Compare Rec. at 226 (stating Mr. Baker had a normal gait, needed no assistance, and had full ROM of all joints) with Rec. at 227 (stating Mr. Baker's exam was limited because he was unable to flex or extend his spine).

## II.  LEGAL STANDARDS

### A.  Standard of Review

In reviewing the Commissioner's final decision, the Court is limited to determining whether the decision was supported by substantial evidence, after reviewing the administrative record as a whole. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 422 (3d Cir. 1999)). If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360)).

Nevertheless, the reviewing court must be wary of treating "the existence [or nonexistence] of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983). The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) (citing Gober v. Matthews, 574 F.2d 772, 776 (3d. Cir. 1978)). Furthermore, evidence is not substantial if "it constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114). As such, District Court review of the final determination is a "qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham." Kent, 710 F.2d at 114.

### B. The Five Step Disability Inquiry

The Commissioner conducts a five-step inquiry to determine whether a claimant is disabled, and therefore, eligible for SSI benefits. Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004); Evaluation of Disability in General, 20 C.F.R. § 404.1520(a)(4) (2012). The Commissioner must first determine whether the claimant is currently engaged in a "substantial gainful activity" ("SGA"). 20 C.F.R. § 404.1520(a)(4). If the claimant is currently engaged in SGA, he is ineligible for SSI benefits; if not, the Commissioner moves on to step two, where she determines whether the claimant is suffering from any severe impairment. Id. Under the SSA, an impairment is "severe" when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

If the Commissioner finds that the claimant's condition is severe, she evaluates whether it meets or equals a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. § 404.1520(d). If the claimant's physical or mental conditions meet the criteria for any impairment listed in the SSA, they are presumed disabled and entitled to benefits. Id. If not, the Commissioner evaluates the claimant's RFC and determines whether he can return to "past relevant work." 20 C.F.R. § 404.1520(e). If the claimant is capable of returning to past relevant work, they are ineligible for SSI benefits. 20 C.F.R. § 404.1520(f). If the ALJ finds the claimant is unable to resume past relevant work, or if there is no past relevant work, the burden then shifts to the ALJ to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy." Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)); see, e.g., Markle v. Barnhart, 324 F.3d 182, 185 (3d. Cir. 2003) (providing an example where the ALJ assumed the evidentiary burden at step five despite claimant's lack of relevant work history).

## III. DISCUSSION

Mr. Baker alleges that the ALJ (1) made an RFC determination that was not based on substantial evidence; (2) failed to properly evaluate his credibility; and (3) failed to establish the availability of other work that he can perform in the national economy. The Court will address these arguments in turn.[2]

### A. The Administrative Law Judge's RFC Determination

#### 1. The Administrative Law Judge's Step Three Determination vs. RFC Assessment

Mr. Baker contends that the RFC assessment conducted at step four – which determined that he can perform the mental demands of unskilled work – conflicts with the ALJ's findings of "moderate difficulties in social functioning" as well as "moderate restriction in maintaining concentration, persistence, and pace" at step three.[3] (Plaintiff's Brief ("Pl's Br.") at 8). He argues that the ALJ was required to address his step three findings with specific references to medical evidence in order to resolve the apparent conflict with the RFC determination, and that a loss of ability to meet basic work-related activities such as understanding, carrying out, and remembering simple instructions or responding appropriately to supervision and coworkers limits the potential occupational base. SSR 85-15, 1985 WL 56857 (Jan. 1, 1985). However, in order to justify a finding of disability, the loss of ability must be substantial and the limitation

---

[2] Mr. Baker has not raised the issue of whether his depressive disorder was properly compared to the criteria for mood disorders listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04, so the Court declines to address it here.
[3] At step three, the ALJ compared the severity of Mr. Baker's mental impairments to the criteria for Intellectual Disability (12.05(d)) and Personality Disorder (12.08(b)) in 20 C.F.R. Pt. 404, Subpt. P, App. 1, which are (1) marked restrictions of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. The ALJ found (1) mild restrictions in activities of daily living; (2) moderate difficulties in social functioning; (3) moderate difficulties in concentration, persistence and pace; and (4) no episodes of decompensation. (Rec. at 14). Because the listed impairments require "marked" limitations, which are more than moderate but less than severe, 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C), the ALJ did not find Mr. Baker's impairments disabling.

9

must be severe. Id. Here the ALJ found only moderate difficulties, which does not conflict with his RFC determination. (Rec. at 14).

### 2. Whether an ALJ Can Make an RFC Determination Without the Assistance of a Physician

Mr. Baker next argues that the RFC is a medical assessment, and therefore, a physician should have assessed his functional abilities. (Pl's Br. at 9). There is conflicting authority on this point. Compare SSR 83-10, 1983 WL 31251 (Jan. 1, 1983) (defining RFC as a medical assessment of what an individual can do in a work setting) with Billingsley v. Comm'r of Soc. Sec., No. 08-1912, 2009 WL 3128436, at *3 (D.N.J. Sept. 25, 2009) (defining RFC as an administrative assessment of what an individual can still do despite his or her limitations) and SSR 96-8P, 1996 WL 374184 (July 2, 1996) (defining RFC as "an administrative assessment of the extent to which an individual's medically determinable impairment(s) . . . may affect his or her capacity" to work).

When a Social Security Ruling ("SSR") is published, it is binding on all components of the Social Security Administration, and represents the policy and interpretations the agency has adopted. Publication, 20 C.F.R. § 402.35(b)(1). Specific policies embodied in a later SSR should control the construction of an earlier SSR, even though it has not been expressly amended. Cf. Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 143 (2000) (citation omitted) (holding that specific policies embodied in later federal statutes should control the construction of the earlier statute, even though it was not expressly amended). SSR 96-8P specifically addresses RFC assessments and was promulgated after SSR 83-10, which is a clarification of the medical-vocational rules of Appendix 2. Because SSR 96-8P is more recent and directly addresses the point at issue, the Court finds that although an assessment from a physician regarding the functional abilities of the claimant is often helpful, Doak v.

Heckler, 790 F.2d 26, 29 (3d. Cir. 1986), the RFC is an administrative assessment of the medical evidence in the record. Therefore, the ALJ did not err as a matter of law by making the determination without relying on a physician's assessment of the record.

### 3. Conflicting Evidence and Development of the Record

Mr. Baker further argues that the ALJ's RFC determination is not supported by medical evidence and therefore cannot be sustained. (Pl's Br. at 8-9). ALJs play an important role in developing the record, resolving evidentiary conflicts, and deciding which evidence to accept or reject. See Plummer, 186 F.3d at 434 (noting that ALJs have a duty to develop the record); Fargnoli, 247 F.3d at 42 (noting the ALJ's duty to decide which evidence to credit and to address conflicting evidence). However, if an ALJ rejects the opinion of a treating physician without pointing to contrary medical opinions, and instead conducts his own lay analysis to make an RFC determination, that determination is not supported by substantial evidence. Ennis v. Astrue, Case No. 4:11-CV-01788, 2013 WL 74375, at *6 (M.D. Pa. Jan. 4, 2013); see also Morales, 225 F.3d at 316-18 (noting that when a treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may not reject it without a good reason); Plummer, 186 F.3d at 429 (noting that treating physicians' reports are entitled to great weight, "especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.")

In Ennis the District Court found, and in Morales the Third Circuit affirmed, that the RFC assessments were not supported by substantial evidence because in each case the ALJ rejected the opinion of a treating physician without pointing to other medical opinions. While the ALJ is not required to specifically address every single statement made by a physician in the RFC determination if it is clear that he reviewed and considered the entire record, "where there is

11

conflicting probative evidence in the record, [the Third Circuit] recognizes a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions. . . ." Fargnoli, 247 F.3d at 42.

While Fargnoli, Ennis, and Morales addressed conflicting evidence between reports from different physicians, it is just as important for the ALJ to address the existence of contradictory evidence within a single report.[4] Cf. Fargnoli, 247 F.3d at 42 (holding that where ALJs fail to address evidentiary conflicts, their determinations are not supported by substantial evidence and will be vacated). The instant case is ripe with contradictions. For example, the examination conducted by Dr. Khona for the New Jersey Department of Work Force Development states that Mr. Baker had full flexion and extension of his thoracic and lumbar spine. (Rec. at 226). Dr. Khona then notes that Mr. Baker's examination was limited because he was unable to flex or extend his spine. (Rec. at 227). These statements cannot coexist because they are inherently contradictory, and the ALJ must address this and any other such conflicts on remand.

The second defect with the ALJ's determination is that he failed to fully develop the record. The ALJ is required to develop the record, especially when there is a suggestion of mental impairment. Plummer, 186 F.3d at 434. Whether Mr. Baker requires reminders to take medication is an example of an area that needs additional development. The claimant stated on March 31, 2010 that he does not need reminders to take medications because he takes no medications. (Rec. at 138). On June 11, 2013 he alleged that he does need reminders to take medications. (Pl's Br. at 7). The Commissioner alleges that Mr. Baker does not need reminders

---

[4] The ALJ is not required to specifically address every point that may or may not conflict when the question is one of degree; however, the ALJ must address directly conflicting statements where if one is true, the other *must* be false. See, e.g., S.H. v. State-Operated School Dist. Of City of Newark, 336 F.3d 260, 270 (3d Cir. 2003) (holding that a reviewing court may only disregard an ALJ's factual findings if "it can point to contrary non-testimonial extrinsic evidence on the record."); Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001) (noting that ALJs are not expected to make reference to every relevant treatment note where there are voluminous medical records).

to take medications, and the ALJ stated in his determination that the Mr. Baker takes no medications. (Commissioner's Brief ("Comm'r Br.") at 13; Rec. at 16). However, Dr. Bogacki noted on June 28, 2011 that Mr. Baker was currently taking trazodone and citalopram, and Mr. Baker testified that he received prescription medication from a doctor at Costar.[5] (Rec. at 39-41, 252). It is not possible for all of these statements to be true and the ALJ must address this conflict on remand. Furthermore, although it appears Mr. Baker was taking prescription medication, there is no evidence in the record from a prescribing physician. Because the ALJ has a duty to develop the record, he must make reasonable efforts to obtain records from Mr. Baker's treating physician on remand. See Residual Functional Capacity, 20 C.F.R. § 404.1545(a)(3).

### B. The Administrative Law Judge's Assessment of Mr. Baker's Credibility

Mr. Baker alleges that the ALJ improperly assessed his credibility because (1) the determination was based on a selective and incomplete discussion of the medical evidence in the record; and (2) he was required to explicitly note his consideration of each factor set forth in 20 C.F.R. § 404.1529(c)(3), and failed to do so. (Pl's Br. at 14).

#### 1. The Administrative Law Judge's Discussion of the Record

In order to properly assess a claimant's credibility, the ALJ must thoroughly discuss objective medical and other evidence, including subjective complaints and his own personal observations. Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999). The ALJ must indicate with specificity which evidence has been rejected and which he is relying on as the basis for his finding, and must give great weight to a claimant's subjective testimony. Id.

---

[5] Costar is a "drop in" center for mentally ill homeless people. (Rec. at 41).

The ALJ's conclusion that Mr. Baker's subjective complaints were not credible is reasonable based on the evidence in the record.  The ALJ correctly noted that while Mr. Baker was incarcerated at Bayside, he did not report mental health problems and that when Dr. Bogacki administered the IQ test, he did not exert any effort which rendered the results inconclusive. (Rec. at 15-16).  However, in order to be supported by substantial evidence, the ALJ's determination must include not only analysis of the evidence he accepts, but also an analysis of the evidence which he rejects.  Schaudeck, 181 F.3d at 433.  Here the ALJ failed to specifically address which evidence was found not credible and why, which is explicitly required in the Third Circuit.  Id.  For example, the ALJ did not explain why the 1987 IQ test was disregarded, nor did he discuss his own personal observations of Mr. Baker or the substance of Mr. Baker's testimony.

The ALJ should have considered the neurological assessment and learning disability evaluation conducted by the Camden City Board of Education and the psychological re-evaluation conducted by Woodrow Wilson High School in 1987 and 1988.  (Pl's Br. at 16).  Mr. Baker was found to be neurologically impaired and placed in special education classes just before his ninth birthday, and his IQ test when he was sixteen indicates a verbal score of 69, a nonverbal score of 77, and a full scaled score of 71.  (Rec. at 239; Pl's Br. at 17).  He relies on the statement that "IQ tests tend to stabilize by the age of 16" and that results obtained "at age 16 or older" should be viewed as a valid indicator of an individual's functioning.  Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(D)(10).  The Commissioner argues that the test results are not relevant because the language in § 112.00(D)(10) applies only to children, and the results are over twenty years old.  (Comm'r Br. at 14).

14

In order to establish the existence of an intellectual disability in the Third Circuit, a claimant must prove that it manifested during the developmental period, or prior to age 22. Cortes v. Commissioner of Social Sec., 225 F. App'x. 646, 652 (3d Cir. 2007); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.  Valid IQ tests from that time period have been used by other district courts as evidence of intellectual disability many years later.  See, e.g., Irwin v. Shalala, 840 F. Supp. 751, 766 (D. Ore. 1993) (holding that an IQ test performed during the claimant's senior year of high school was relevant to assessing her credibility and provided a valid baseline from which to measure a marked decrease in IQ roughly twenty years later).

The Fourth, Seventh, Eighth, and Eleventh Circuits have adopted a rebuttable presumption that current IQ tests administered significantly after age 22 may be used to show evidence of intellectual disability at an earlier time.  See Hodges v. Barnhart, 276 F.3d 1265, 1268 (11th Cir. 2001) (holding that IQ is relatively constant and a score after age 22 raises the presumption that the IQ score was the same prior to age 22); Muncy v. Apfel, 237 F.3d 728, 734 (8th Cir. 2001) (holding that a person's IQ is presumed to remain stable over time absent some external factor that might have caused a change in a claimant's intellectual functioning); Luckey v. U.S. Dept. of Health & Human Services, 890 F.2d 666, 668 (4th Cir. 1989) (holding that absent evidence that the claimant's IQ had changed, a current IQ assessment clearly demonstrated intellectual disability with an onset before age twenty-two); Guzman v. Bowen, 801 F.2d 273, 275 (7th Cir. 1986) (holding that absent evidence to the contrary, it is assumed that an IQ test taken after age 22 accurately reflects the person's IQ during the developmental period prior to age 22).

The Third Circuit has not adopted such a presumption, and instead requires claimants to prove they were intellectually disabled prior to age twenty-two.  Cortes, 255 F. App'x. at 652

(citing Williams v. Sullivan, 970 F.2d 1178, 1185 (3d Cir. 1992)) (rejecting the adoption of a rebuttable presumption that a current mental impairment existed before age twenty-two). Early childhood IQ tests are not required to establish an intellectual disability; rather, claimants need only produce evidence that shows the existence of the impairment prior to age twenty-two. Id. at 652-63. Placement in special education, dropping out of school, struggling to get a GED, unemployment or limited employment, absent a traumatic event that might have caused brain damage, is consistent with and could be said to support the onset of an intellectual disability prior to age twenty-two. Markle, 324 F.3d at 188-89.

The Commissioner has asserted that § 112.00 is inapplicable, which is correct to the extent that it would be inappropriate to assess Mr. Baker's impairments under § 112.00. However, the Court is not concerned with whether § 112.00 may be used to assess Mr. Baker's impairments; it is concerned with whether the 1987 IQ test is relevant and should have been addressed by the ALJ. Given that current IQ test results cannot establish early onset intellectual disability in the Third Circuit, if the Court were to accept the Commissioner's assertion that IQ tests administered during the developmental period can never be sufficiently current to be relevant many years later, adult claimants would be precluded from presenting any IQ test results capable of satisfying the requirements of § 12.05. Such a result is clearly unacceptable.

Furthermore, interpreting the language of § 112.00(D)(10) to be categorically inapplicable the moment a claimant turns eighteen would contradict part of the plain language of the rule and render other parts superfluous. "When interpreting a statute, courts should endeavor to give meaning to every word which Congress used and therefore should avoid an interpretation which renders an element of the language superfluous." Rosenberg v. XM Ventures, 274 F.3d 137, 141 (3d Cir. 2001). "The same rules of construction apply to administrative rules as to

statutes." Alabama Tissue Ctr. of Univ. of Alabama Health Serv. Found., P.C. v. Sullivan, 975 F.2d 373, 379 (7th Cir. 1992); Sutherland Statutes and Statutory Construction § 31:6 (7th ed. 2013). A complete reading of § 112.00(D)(10) reveals:

> IQ test results must also be sufficiently current for accurate assessment under 112.05. Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above. IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(D)(10).

For the purpose of § 112.00, a child is someone who is under 18 years of age. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(A). The fact that an assessment conducted at age 15 would be applicable to a 19 year old if the score was less than 40 contradicts the Commissioner's assertion that § 112.00(D)(10) only applies to children. Furthermore, restricting the language that IQ tests stabilize after 16 by interpreting it to apply only to people under age 18 would render it superfluous, because any IQ test performed would already be covered by the statement that IQ tests obtained between ages 7 and 16 are valid for either two or four years. Finally, the plain language that IQ tests stabilize after age 16 supports Mr. Baker's assertion that the test may be valid and should have been considered. See Barnhart v. Walton, 535 U.S. 212, 217-18 (2002) (citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984) (noting that if the language of a statute is unambiguous, the court must give effect to the expressed intent of Congress).

17

The Court cannot find, and the Commissioner does not offer, any evidence or authority suggesting that the proffered IQ test is not valid.[6]  Even if such evidence existed, the Court would have no way of knowing whether the ALJ actually relied on it, because he declined to address it.  The Commissioner mentions the IQ test administered by Dr. Bogacki, in which Mr. Baker failed to exert maximum effort and scored a 51, but fails to explain how it relates to the validity of the 1987 test.  (Comm'r Br. at 14-15).  While the ALJ was certainly within his right to use Dr. Bogacki's 2011 report to support a negative credibility determination, it does not follow that other evidence in the record is invalid and need not be addressed.  The Court finds that because the 1987 IQ test appears valid, and seems consistent with other objective evidence in the record, including Mr. Baker's school, medical, and work history, the ALJ erred by not addressing it in his determination.

### 2. The Administrative Law Judge's Consideration of the Pain Factors

Although the ALJ is not required to explicitly note each "pain factor" listed in the Code of Federal Regulations when evaluating subjective symptoms, he must at least consider them. Medical Considerations, 20 C.F.R. § 404.1529(c)(3).  It is clear from the ALJ's decision that he did not adequately consider at least one of the required factors because he did not address the prescription anti-depressants noted by Dr. Bogacki.[7]  On remand, the ALJ should ensure that all of the factors relevant to Mr. Baker's symptoms are considered.

---

[6] The narrative report that accompanies IQ test results is typically used to assess whether the scores are valid and consistent with the developmental history and the degree of functional limitation.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(a).  In this case, the examiner noted that Mr. Baker "exerted strong effort throughout the evaluation session," but performed "substantially beneath expectations for pupils of his present chronological age." (Rec. at 240).

[7] Relevant factors that will be considered include, inter alia, "the type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms."  Medical Considerations, 20 C.F.R. § 404.1529(c)(3)(iv).

C. **The Administrative Law Judge's Step Five Determination of the Availability of Work in the National Economy**

Mr. Baker alleges that the Commissioner failed to carry her burden of proving the existence of jobs in the national economy that Mr. Baker could perform because the ALJ did not elicit the testimony of a vocational expert, which was required due to his social limitations, concentration limitations, and mental impairments.[8] (Pl's Br. at 19-23). However, the use of a vocational expert is discretionary, and the use of the guidelines as a framework in a case involving nonexertional impairments, followed by reliance on an SSR at step five, "is not an improper application of either case law or rules established by the Agency." Allen v. Barnhart, 417 F.3d 396, 404 (3d Cir. 2005); Vocational Considerations, 20 C.F.R. § 416.966(e). When an ALJ relies on an SSR to connect the degree of a claimant's limitations to the size of the occupational base, specific references to the claimant's work-related limitations are required. Allen, 417 F.3d at 404. A conclusory reference to an SSR is not sufficient at step five because it prevents the reviewing Court from determining whether the Rule was relied upon in a permissible way, or whether an individualized determination was required. Id. at 406. Administrative Law Judges must demonstrate a "fit" between the facts of a given case and the way in which the SSR dictates that such nonexertional limitations impact the base. Id. at 405.

On remand, the ALJ should reconsider his step five determination to the extent that it was based on an RFC that was not supported by substantial evidence.[9]

---

[8] As noted above, the ALJ's decision became the final decision of the Commissioner when the ODAR declined to review the case.

[9] The parties have argued the appropriateness of the application of the Medical-Vocational Guidelines found in 20 C.F.R. § 404 Subpt. P, App. 2. The Court declines to wade into these arguments given that the ALJ's step five determination was based on a flawed RFC determination. On remand, the Court urges the ALJ to articulate a thorough explanation of how SSR 85-15 connects Mr. Baker's work-related limitations to the size of his occupational base, and consider whether a vocational expert would assist in the step five determination.

## IV. CONCLUSION

For the reasons discussed above, the Court cannot find that the ALJ's determination is supported by substantial evidence. As a result, the Court will vacate the ALJ's decision and remand the matter to the ALJ for further proceedings consistent with this Opinion. An appropriate order shall enter today.


Dated: 6/13/2014                                                          s/ Robert B. Kugler
                                                                          ROBERT B. KUGLER
                                                                          United States District Judge